UNITED STATES DISTRICT COURT

DISTRICT OF NEW MEXICO

---

SHERRY MILLIRON,

     Plaintiff,

v.

704 HTL OPERATING, LLC,

     Defendant.

No. CIV 09-0694 BRB/ACT

---

ORDER DENYING DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

---

Plaintiff Sherry Milliron filed a lawsuit against Defendant 704 HTL Operating, LLC, seeking monetary damages for a hostile work environment and retaliation in violation of Title VII of the Civil Rights Act of 1964.  Defendant has filed motions for summary judgment on all of Plaintiff's claims.

## I.

Defendant is a Texas limited liability company which owns and operates the MCM Elegante Hotel ("the Hotel") in Albuquerque, New Mexico.[1]  Defendant employed Plaintiff in various capacities (cocktail waitress, bartender, and cashier) at the Hotel from July or September 2004 through September 2008.  Def. Mot. Sum. J. Sexual Harassment, Ex. A at

---

[1] Defendant claims that John Bushman is also the owner of the Hotel, which Plaintiff disputes

¶ 8 (doc. #47); Plf. Resp. Mot. Sum. J. Sex. Har., Ex. C, Plf. Aff. at ¶ 2 (doc. #51).  Plaintiff argues that beginning in November 2007 she endured a hostile work environment as a result of the sexual harassment perpetrated by two of her supervisors—Theresa Vigil, the Hotel's restaurant supervisor, and Guillermo Sanchez, Defendant's food and beverage director.  Plf. Resp. Mot. Sum. J. Sex. Har. at 2 (doc. #51).  In August 2008, Plaintiff received four negative Employee Performance Reports.  Plf. Resp. Mot. Sum. J. Retaliation at ¶ 26 (doc. #49); Def. Mot. Sum. J. Retal. at ¶ 15 (doc. #44).  Defendant terminated Plaintiff's employment effective September 25, 2008.  Def. Mot. Sum. J. Retal., Ex. D (doc. #44).

## II.

Federal Rule of Civil Procedure 56 instructs summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  "Once the movant shows the absence of a genuine issue of material fact, the non-moving party 'must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof.'"  PJ ex rel. Jensen v. Wagner, 603 F.3d 1182, 1192 (10th Cir. 2010) (quoting Garrison v. Gambro, Inc., 428 F.3d 933, 935 (10th Cir.2005)).  Therefore, the non-moving party must present "sufficient facts that a reasonable jury could find in his or her favor."  Id. at 1192–93.  A party opposing summary judgment "may not rely merely on allegations or denials in its own pleading; rather its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  In conducting

this analysis, this Court must "'view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.'" <u>Koch Industries, Inc. v. U.S.</u>, 603 F.3d 816, 820–21 (10th Cir. 2010) (quoting <u>Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.</u>, 165 F.3d 1321, 1326 (10th Cir.1999)).

## III.

Plaintiff argues Ms. Vigil's and Mr. Sanchez's sexual harassment was so severe and/or pervasive that it constituted a hostile work environment contrary to Title VII and that Defendant failed to take reasonable care to prevent or correct promptly this sexual harassment.  Comp. at ¶¶ 26–27 (doc. #1).  Defendant filed two motions for summary judgment in response to Plaintiff's claim of a hostile work environment—Motion for Summary Judgment on Plaintiff's Claim of Same-Sex Harassment and Motion for Summary Judgment on Claim of Sexual Harassment.  (doc. #46 & #47).  In its "Motion for Summary Judgment on Plaintiff's Claim of Same-Sex Harassment" Defendant argues that this Court must review Plaintiff's accusations involving Ms. Vigil separately from her accusations involving Mr. Sanchez.  However, Plaintiff states in her complaint that she sues Defendant on the basis of a single hostile work environment created by both Ms. Vigil and Mr. Sanchez.  Defendant may not bifurcate Plaintiff's single claim of a hostile work environment or re-frame her complaint to suit its purposes. Therefore, the Court DENIES Defendant's Motion for Summary Judgment on Plaintiff's claim of same-sex harassment.

## IV.

In its "Motion for Summary Judgment on Plaintiff's Claim of Sexual Harassment"

3

Defendant argues Plaintiff has not established a hostile work environment claim because she has failed to show "harassing behavior 'sufficiently severe or pervasive to alter the conditions of [her] employment.'" Pennsylvania State Police v. Suders, 542 U.S. 129, 133 (2004) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)).  In addition, Defendant contends that regardless of the alleged hostile work environment, it is entitled to summary judgment on this claim because it has shown Plaintiff unreasonably failed to avail herself of its adequate policy for promptly correcting sexual harassment.  Plaintiff responds Defendant is not entitled to the Faragher/Ellerth affirmative defense because Defendant took a tangible employment action against her by terminating her employment.

A.

An employer such as Defendant "is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998).  A plaintiff alleging a hostile work environment must "'show (1) that she was discriminated against because of her sex; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment." Medina v. Income Support Div., 413 F.3d 1131, 1134 (10th Cir. 2005).  However, the Supreme Court has explained:

> An employer may defend against such a claim by showing both (1) that it had installed a readily accessible and effective policy for reporting and resolving complaints of sexual harassment, and (2) that the plaintiff unreasonably failed to avail herself of that employer-provided preventive or remedial apparatus.

4

Suders, 542 U.S. at 134.  But this Faragher/Ellerth affirmative defense is not available to the

employer "when the supervisor's harassment culminates in a tangible employment action,

such as discharge, demotion, or undesirable reassignment." Faragher v. City of Boca Raton,

524 U.S. 775, 808 (1998).

## B.

Before addressing Defendant's proffered affirmative defense, this Court must first

consider whether Plaintiff has demonstrated a genuine issue of material fact exists as to

whether Ms. Vigil's and Mr. Sanchez's conduct created a hostile work environment as

defined by Title VII.  Defendant argues Plaintiff has failed to establish she endured a hostile

work environment because Plaintiff admits Ms. Vigil's alleged conduct only occurred once

and Plaintiff has not offered any evidence to show that Mr. Sanchez's alleged harassment

was so severe or pervasive that it altered the terms of her employment since there is no

evidence she missed work, cut back on hours, avoided working, or even avoided working

around Mr. Sanchez.

"The question on summary judgment, then, is whether a jury, in view of all of the

evidence, could reasonably conclude the discriminatory harassment to be sufficiently severe

or pervasive as 'to alter the conditions of [the victim's] employment and create an abusive

working environment,' . . . and that the victim subjectively perceived the environment to be

abusive." Montes v. Vail Clinic, Inc., 497 F.3d 1160, 1170 (10th Cir. 2007) (quoting

Meritor, 477 U.S. at 67).  An actionable hostile work environment is "'permeated with [sex]

discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working environment.'" Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 680 (10th Cir. 2007).  Notably "the severity and pervasiveness evaluation is particularly unsuited for summary judgment because it is quintessentially a question of fact." O'Shea v. Yellow Tech. Serv., Inc., 185 F.3d 1093, 1098 (10th Cir. 1999).

"In order to prevail on the subjective component of this test, the law does not require a plaintiff to show that the discriminatorily abusive work environment seriously affected her psychological well-being . . . or that it tangibly impaired her work performance . . . . Likewise it does not require that she quit or want to quit the employment in question." Davis v. U.S. Postal Serv., 142 F.3d 1334, 1341 (10th Cir. 1998).  Thus, Defendant is mistaken in its implication that Plaintiff must show she missed work, cut back on hours, avoided working, or avoided working around Mr. Sanchez.  Plaintiff has stated she felt humiliated and upset by Ms. Vigil's actions, though she did not define them using the legal term "sexual harassment."  Plf. Resp. Mot. Sum. J. Same-Sex Har., Ex B, Plf. Dep. at 125 (doc. #50).  She also told Mr. Sanchez to stop making sexual comments to her, complained twice to the Hotel's Human Resources Director, Luanne Slough, about his conduct, and expressed that she found his inappropriate, upsetting, and humiliating.  Plf. Resp. Mot. Sum. J. Sex. Har., Ex. C, Plf. Aff. at ¶ 12 & Ex. B, Plf. Dep. at 64–65 (doc. #51).  Plaintiff has consequently sufficiently raised a genuine issue of material fact as to whether she subjectively found her work environment abusive or hostile.

"Whether an environment is [objectively] hostile or abusive 'can be determined only

6

by looking at all the circumstances . . . [including] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Davis v. U.S. Postal Service, 142 F.3d 1334, 1341 (10th Cir. 1998).  In conducting this inquiry, the law requires this Court to consider the "record as a whole" and "the totality of the circumstances, including the context in which the alleged incidents occurred" drawing all reasonable inferences in Plaintiff's favor.  O'Shea, 185 F.3d at 1097 (internal quotations omitted).  This Court may consider alleged incidents of sexual harassment directed at employees other than Plaintiff as evidence of a general work atmosphere.  Hicks v. Gates Rubber Co., 833 F.3d 1406, 1415 (10th Cir. 1987); EEOC v. PVNF, L.L.C., 487 F.3d 790, 798 (10th Cir. 2007) ("We have never held, nor would we, that to be subjected to a hostile work environment the discriminatory conduct must be both directed at the victim and intended to be received by the victim.").  Because the law calls for an analysis of the "environment," this Court may also consider conduct which is not necessarily gender-based or "'explicitly sexual in nature.'" O'Shea, 185 F.3d at 1097.

According to Plaintiff, in November of 2007, while she worked as a cocktail waitress at the Hotel's bar and Ms. Vigil was her supervisor, Ms. Vigil showed a picture of Plaintiff's underwear-clad buttocks and a picture of her exiting a shower to Jesse Hess on the Hotel's office computer while he was in her office applying for a job.  Plf. Resp. Mot. Sum. J. Retal., Ex. A, Plf. Dep. at 39 (doc. #49).  Mr. Hess texted Plaintiff that he could see her butt and that he was in Ms. Vigil's office.  Id. at 39–41.  Plaintiff entered Ms. Vigil's office, Mr. Hess

7

pointed to Ms. Vigil's computer screen, Plaintiff then saw both pictures, and she left without saying anything to Ms. Vigil.  <u>Id.</u> at 39–41.  Plaintiff asserts Ms. Vigil had the pictures on her cell phone and had downloaded them from her T-Mobile Album account on the Hotel's office computer.  <u>Id.</u> at 41.  The pictures were about a 4X6 or 3X5 size on the computer screen.  <u>Id.</u> at 41.  Plaintiff claims she did not know Ms. Vigil took these pictures and could not say when she thought Ms. Vigil took the pictures.  <u>Id.</u> at 35–37, 38.

Predictably, Defendant's account of this incident differs from Plaintiff's.  Defendant maintains that in or around November 2007, Ms. Vigil took the picture of Plaintiff's buttocks at Plaintiff's home with Plaintiff's permission.  Def. Mot. Sum. J. Sex. Har., Ex. E, Vigil Dep. at 14 (doc. #47).  In or around November 2007, Ms. Vigil brought her camera to work to transfer photos, including the photo of Plaintiff's buttocks, from her memory card to a flash drive.  <u>Id.</u> at 15–17.  While transferring her pictures, Mr. Hess saw only the picture of Plaintiff's buttocks.  <u>Id.</u>  Plaintiff complained about Ms. Vigil showing the photograph at work to Ms. Slough, the Hotel's Human Resource Director.  <u>Id.</u> at 47–48; Def. Mot. Sum. J. Sex. Har., Ex. D, Slough Dep. at 40–41 (doc. #47).  Ms. Slough investigated the incident by questioning Ms. Vigil about the photograph, verbally counseling her, and telling her to delete the photograph.  Vigil Dep. at 21–22; Slough Dep. at 46–47.  The photograph was deleted and Ms. Slough made sure the photograph was not on the computer at Defendant's office.  Slough Dep. at 46; Vigil Dep. at 21–22.  Defendant and Plaintiff agree the incident with the photograph did not happen again.  Def. Mot. Sum. J. Sex. Har., Ex. B, Plf. Dep. at 54 (doc. #47).

Courts have explained that displaying photographs of scantily-clad women in the workplace has "clear gender-related implications." Clarke v. Bank of Commerce, 506 F.Supp.2d 851, 863 (N.D. Okla. 2007). A jury could conclude this to be particularly the case when the photos are not of some unknown female but of Plaintiff herself and are displayed to other individuals at her workplace. For this reason, Defendant's reliance on Plaintiff's following deposition testimony is not dispositive at the summary judgment stage:

> Q. Do you believe that [Ms. Vigil] in any way intended to personally harass you sexually? In other words, that she had any sexual interest in you.
> A. I'm going to say no.
> Q. Do you think that there was any intent in showing these pictures to somehow seduce you or otherwise show some sort of sexual attraction to you?
> A. I'm going to say no. I don't think so.

Def. Mot. Sum. J. Sex. Har., Ex. B, Plf. Dep. at 56 (doc. #47). Later in her deposition, Plaintiff testified that she did not think Ms. Vigil "sexually harassed her," but that her showing these pictures on her work computer embarrassed, exposed, and humiliated her. Plf. Resp. Mot. Sum. J. Same-Sex Har., Ex. B., Plf. Dep. at 125 (doc. #50). Homosexual desire is but one way to demonstrate discrimination on the basis of sex. Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 80 (1998). "A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace." Id. Given the mandated "totality of the circumstances" inquiry and the arguably sexual nature of Ms. Vigil's alleged conduct—displaying nearly nude photographs of Plaintiff—Plaintiff has submitted evidence

9

from which a reasonable jury could conclude Ms. Vigil's conduct was based on gender or sexual animus, and contributed to a hostile work environment.  O'Shea, 185 F.3d at 1099 ("Because of the overtly sexual nature of these incidents, we think a jury readily could find that they were based on gender or sexual animus.").

Plaintiff asserts that after Ms. Vigil displayed the photographs of her, Mr. Sanchez began a pattern and course of sexually harassing conduct toward her and other female employees.  While Plaintiff maintains he made inappropriate comments to her prior beginning in February or March 2008, it was not until April or May 2008 that his behavior became consistently sexually inappropriate.  Plf. Resp. Mot. Sum. J. Sex. Har., Ex. B, Plf. Dep. at 58–59 (doc #51).  Plaintiff testified that "quite often" Mr. Sanchez gestured to her and verbally implied he wanted her to perform oral sex by pretending to unzip his pants while she was bending down and saying "'Since you are down there . . . ." Id. at 63; Plf. Resp. Mot. Sum. J. Sex. Har., Ex. C, Plf. Aff. at ¶ 6 (doc. #51).  She avers that Mr. Sanchez frequently told her that her "butt looks nice bent over" while she was bending over.  Plf. Aff. at ¶ 5.  Plaintiff alleges Mr. Sanchez frequently comment to her that he was "so horny" and touched her hair.  Id. at ¶ 7.  She testified Mr. Sanchez would make comments to her about "other girls or guests," describing "[t]heir nice body or admiring their breasts."  Plf. Dep. at 59.  She says in September 2008, Mr. Sanchez slapped her on the buttocks while she was conversing with Hotel guests, humiliating her.  Plf. Aff. at ¶ 9.

In addition, Plaintiff avers she overheard Mr. Sanchez make sexual comments, similar to the remarks he made to her, to other female employees.  Plf. Aff. at ¶ 8.  Plaintiff testified

she witnessed Mr. Sanchez slap the buttocks of a female co-worker, Nicole Pesata, and supported this testimony with Ms. Pesata's affidavit. Ms. Pesata confirmed that Mr. Sanchez had grabbed her buttocks at work and that she had witnessed Mr. Sanchez touching Plaintiff's hair. Plf. Resp. Mot. Sum. J. Sex. Har., Ex. G, Pesata Aff. at ¶¶ 8, 18 (doc. #51). Ms. Pesata also averred Mr. Sanchez made sexual comments to her about her breasts and buttocks, touched her hair, and asked her out on dates approximately fifteen times. Id. at ¶¶ 11–13.

Plaintiff also submitted the deposition testimony of another female co-worker, Regina Turberville. Ms. Turberville described Mr. Sanchez petting her from her head to her shoulder and said that he would say things to her like: "'Hey, how about we get a hotel room?'" Plf. Resp. Mot. Sum. J. Sex. Har., Ex. A, Turberville Dep. at 7, 16 (doc. #51). Ms. Turberville also recalled standing next to Mr. Sanchez on a smoke break when a customer approached the two of them. According to her, Mr. Sanchez said to the customer "'What does it look like we're doing? And you're interrupting. She's on her knees in front of me.'" Id. at 8. She confirmed Plaintiff's assessment of the workplace environment: Mr. Sanchez "made a lot of girls feel uncomfortable working there." Id. at 10; see Smith v. Nw. Fin. Acceptance, Inc., 129 F.3d 1408, 1413 (10th Cir. 1997) (stating that testimony from the plaintiff's co-workers about their perceptions of the alleged harasser's behavior and its impact on the office "supports the court's conclusion that a reasonable person would find the sexual harassment severe and work environment therefore hostile or abusive").

Lastly, Plaintiff states on July 29, 2008 she was sexually harassed by a male customer

11

at the Hotel bar who made comments about her breasts, how she looked bent over, how nice she would look bent over his bed, and how he would like to "open" her.  Comp. at ¶ 17; Plf. Resp. Mot. Sum. J. Sex. Har., Ex. B, Plf. Dep. at 85–86 (doc. #51).  When Plaintiff asked him to leave the bar, she says he yelled obscenities at her.  Plf. Dep. at 85.  According to Plaintiff, when she told Mr. Sanchez about that encounter the following day he told her that the customer was sent by Mr. Lasater from Defendant's corporate office to see how she would handle the situation and that she had "failed" the test by losing her temper.  Plf. Dep. at 85–92; Comp. at ¶ 17.  Ed Lasater is the President of Defendant.  Def. Mot. Sum. J. Sex. Har. at 2.

Essentially, Plaintiff claims that over the course of approximately eleven months she was subjected to seven incidents of unsolicited, overtly sexual comments, gestures and touching as well as the public exposure of nearly nude photographs of her by Defendant's employees.  Drawing all reasonable inferences in Plaintiff's favor, this number may actually be higher given her and other female employees' assertions under oath that Mr. Sanchez "often" or "frequently" made sexual comments and gestures towards them in the workplace. "Because of the overtly sexual nature of these incidents . . . a jury readily could find that they were based on gender or sexual animus."  O'Shea, 185 F.3d at 1099.  Given the frequency, public setting, physically humiliating nature, and sexual content of some or all of Plaintiff's allegations, a reasonable jury could conclude from the facts so far demonstrated and taken in the light most favorable to Plaintiff that a reasonable person would find Plaintiff's work environment hostile or abusive.

C.

An employer has no affirmative defense to vicarious liability for the harassment of its supervisors "when 'the supervisor's harassment culminates in a tangible employment act, such as discharge, demotion, or undesirable reassignment.'" Pinkerton v. Colo. Dep't of Transp., 563 F.3d 1052, 1059 (10th Cir. 2009) (quoting Ellerth, 524 U.S. at 765). Here, Defendant fired Plaintiff which "would certainly qualify as a tangible employment action, given that the Supreme Court defined that term to include 'significant change[s] in employment status, such as hiring, *firing*, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Id. (quoting Ellerth, 524 U.S. at 761) (emphasis added). The question the facts pose then is: Did the alleged harassment *culminate* in or *cause* the negative write-ups and her termination? See id.

First, Defendant notes Plaintiff has claimed she endured a hostile work environment and that Defendant retaliated against her for complaining about that environment by firing her, but not that Defendant fired her as part of the sexual harassment itself. But, Defendant's argument cuts too fine a line. In her complaint, Plaintiff alleges that "[t]he motivating factor in Defendant's decision to terminate Plaintiff was retaliation on the basis of Plaintiff's complaints to Luanne Slough regarding sexual harassment." Comp. at ¶ 22. But in her responses to Defendant's motions, Plaintiff repeatedly asserts that (1) Ms. Vigil and Mr. Sanchez sexually harassed her; (2) she complained to Ms. Slough and Mr. Sanchez about that sexual harassment; (3) Ms. Slough made only a cursory investigation into Plaintiff's

13

complaint about Ms. Vigil and took no action in response to her complaints about Mr. Sanchez; (4) shortly thereafter she was issued four negative Employee Performance Reports, all signed by Ms. Slough and Mr. Sanchez; (5) these reports formed the basis of her termination; and, (6) Ms. Slough and Mr. Sanchez terminated her employment. Thus, Plaintiff appears to claim those involved in her sexual harassment also fired her.

Defendant alternatively contends Plaintiff has shown no facts that show any alleged sexual harassment culminated in or caused her termination. But, as described above, Plaintiff does point to facts that suggest that those involved in the decision to terminate her employment were also those she claims sexually harassed her. She maintains that in reality Mr. Sanchez and Ms. Slough, rather than the newly hired General Manager Shannon Mullan, made the decision to terminate her employment. Ms. Mullan, who Defendant argues possessed final authority to terminate Plaintiff, did not become the Hotel's general manager until August 1, 2008. Def. Mot. Sum. J. Sex. Har., Ex. A, Mullan Aff. at ¶ 4 (doc. #47). Thus, this appears to be a subordinate bias theory of causation, i.e., Mr. Sanchez and/or Ms. Slough's own discriminatory bias caused Plaintiff's tangible employment action even though they may not have been the final decisionmakers regarding her termination. Notably, however, Plaintiff fails to explicitly rely on that theory of causation or cite any cases that address it.

"[U]nder certain circumstances, a defendant may be held liable for a subordinate employee's prejudice even if the manager lacked discriminatory intent." English v. Colo. Dep't of Corr., 548 F.3d 1002, 1001 (10th Cir. 2001). This is possible when the

14

decisionmaker acts as "rubber stamp" or "cat's paw" by following the biased recommendation of a subordinate without independently investigating the complaint against the employee.  Id.; see also EEOC v. BCI Coca-Cola Bottling Co., 450 F.3d 476, 485 (10th Cir. 2006).  The Tenth Circuit has explained that "[t]o survive summary judgment on a subordinate bias theory, the plaintiff must first establish a genuine issue of material fact concerning the bias of the subordinate."  BCI Coca-Cola, 450 F.3d at 488.  And, second, the "plaintiff must establish more than mere 'influence' or 'input' in the decisionmaking process.  Rather, the issue is whether the biased subordinate's discriminatory reports, recommendation, or other actions *caused* the adverse employment action."  Id. at 487 (emphasis added).  But, an employer may nonetheless avoid liability "by conducting an independent investigation of the allegations against an employee.  In that event, the employer has taken care not to rely exclusively on the say-so of the biased subordinate, and the causal link is defeated."  Id. at 488.

As the discussion regarding Plaintiff's hostile work environment claim above illustrates, Plaintiff has demonstrated a genuine issue as to whether Mr. Sanchez perpetrated actionable sexual harassment.  Plaintiff has therefore shown a genuine issue exists regarding Mr. Sanchez's discriminatory bias.  She has not, however, made any such argument with regard to Ms. Slough.  Plaintiff specifically explains that she claims Ms. Slough unreasonably failed to correct the harassment, but does not claim that Ms. Slough sexually harassed her or otherwise discriminated against her on the basis of her sex.

Defendant submitted the affidavit of Ms. Mullan, who avers she became the General

Manager of the Hotel on August 1, 2008 and, as a result, supervised all employees at the Hotel and possessed the final authority to terminate those employees.  Def. Mot. for Sum. J. Retal., Ex. A, Mullan Aff. at ¶ 4–6 (doc. #47).  She explained that although Ms. Slough and Mr. Sanchez participated in the decision to terminate Plaintiff, she made the final decision to terminate Plaintiff because of an email she received from a sales manager about Plaintiff's conduct and Plaintiff's previous, documented misconduct.  Id. at ¶ 10–11.  Ms. Mullan also avers that at the time she made the decision to terminate Plaintiff's employment, she was unaware of any of Plaintiff's alleged complaints of sexual harassment while at the Hotel by Ms. Vigil, Mr. Sanchez, or any customers.  Id. at ¶ 13–17.  In addition, Defendant submitted the Employee Performance Report dated September 25 which notified Plaintiff that Defendant had terminated her employment.  Def. Mot. Sum. J. Retal., Ex. D (doc. #44).  Attached to that exhibit is an email exchange between the sales manager, Leone Medina, and Ms. Mullan.  On September 23, Ms. Medina emailed Ms. Mullan:

> On my lunch today with David Hunter, [Plaintiff] was having a conversation with Rick from Engineering and was changing a light bulb or something above the bar area.  She told him that she had to do it so Memo would not Bitch.  It was so clear it sounded as if she was at our same table.
>
> We also, asked if they could turn down the air because it was cold and my client rubbing his arm from being cold.  Albert asked her if he could turn the air down because a client had asked and she loudly said, I can not turn the air down when she walked over to the thermastat and turned it down.

That same day, Ms. Mullan forwarded this email to Ms. Slough asking "Will you take care of this with memo for me."  Ms. Slough responded:

> On August 8, Memo and I did a coach for Sherry regarding discourteous

16

conduct toward guests.  This was the incident where she refused to serve a guest without ID and the guest was a friend of Mr. Bushman.  The guest then wrote a lengthy comment card that went back to our corporate office.  My feeling is that use of inappropriate language in earshot of a guest is disrespectful, even though she was not speaking to the guest.  I will discuss this with Memo on Wednesday, however, I think it is time to separate employment with Sherry.  She can be very good with guests, however, she exercises very poor judgment and has been talked to on numerous occasions regarding this issue.  What are your thoughts?

Ms. Mullan responded: "I support that."  On September 25, Ms. Slough and Mr. Sanchez notified Plaintiff of her termination and gave her a final Employee Performance Report which summarized Ms. Medina's complaint, characterized Plaintiff's misconduct as "disrespectful or discourteous conduct to customers, supervisors or fellow employees; Standards of Conduct A 6," indicated Plaintiff had "been counseled on this or a similar performance issue before" on August 8, 2008, and declared Plaintiff's employment was terminated effective September 25.  Plaintiff denies making the comment "so Memo won't bitch."

One of the four Employee Performance Reports Plaintiff received in August indicates it is about an incident that occurred on August 8.  Plf. Resp. Mot. Sum. J. Retal, Ex. D (doc. #49).  The report is signed and dated by Mr. Sanchez and Ms. Slough on August 21, when they apparently gave it to Plaintiff.  The report is also signed by Ms. Mullan, but that signature is dated August 26, 2008—after report had been written and given to Plaintiff.  The report states it is based upon a comment card submitted by a guest who claimed Plaintiff would not serve her because she did not have identification on her but was over fifty years old and so, by her own admission, looked well over the legal age—the same incident Ms.

17

Slough described in her email to Ms. Mullan as an example of Plaintiff's documented, similar misconduct.  The comment card is attached to that Report which Defendant submitted with its reply to Plaintiff's response to its motion for summary judgment and reflects the fact that the guest was quite dissatisfied with Plaintiff's refusing to serve her and Plaintiff's subsequent attitude towards her, and intended to notify Defendant's corporate office.  Def. Reply Mot. Sum. J. Retal., Ex. I (doc. #63).

Plaintiff does not deny the August 8 incident occurred.  She actually signed the report and wrote "I thought I was doing what was right."  Plaintiff contends that Defendant's policy required her to refuse to serve alcohol to those customers without identification regardless of their age.  Mr. Sanchez confirmed at his deposition that it was Defendant's policy to request identification from every customer regardless of how old they appeared and to refuse to serve those who did not have identification.  Plf. Resp. Mot. Sum. J. Retal., Ex. B, Sanchez Dep. at 30–31 (doc. #49).  The report also indicates, however, that the guest who filed the complaint watched Plaintiff serve other guests without asking for their identification.  Plf. Resp. Mot. Sum. J. Retal., Ex. D.

In addition, Plaintiff counters that Mr. Sanchez testified that he and Ms. Slough alone made the decision to terminate Plaintiff and only Ms. Slough and Mr. Sanchez were present at Plaintiff's termination meeting.  And even if Ms. Mullan was involved in the decision to terminate her employment, Plaintiff asserts Ms. Slough and Mr. Sanchez made the decision to terminate Plaintiff, Ms. Slough recommended terminating Plaintiff, and Ms. Mullan accepted that recommendation.

18

At his deposition, Mr. Sanchez actually testified as follows:

Q. You were involved in [Plaintiff]'s termination, correct?
A. Yes.
Q. And were you the one that made the decision to terminate her?
A. We did it.  We did it together.
Q. Who is "we"?
A. Human Resources and myself.
Q. Would that be Ms. Slough?
A. Yes. She had write-ups—so many write-ups.  That was the reason she got terminated.
Q. Okay.  Do you know who issued the write-ups.  Were those issued by you?
A. I start them off and Ms. Slough helped me off to finish it.
Q. Did you discuss [Plaintiff]'s termination with anyone besides Ms. Slough?
A. No.
Q. Did you ever have discussions with Ms. Vigil about those?
A. No.

*** 

Q. Mr. Sanchez, with respect to [Plaintiff's] termination, would the General Manger have the ultimate decision on that?
A. Yes, she did.
Q. And then in this case, that would have been Shannon Mullen?
A. Yes.

Plf. Resp. Mot. Sum. J. Retal., Ex. B, Sanchez Dep. at 29–30 (doc. #49); Def. Reply Mot. Sum. J. Retal., Ex. H, Sanchez Dep. at 72–73 (doc. #63).  Ms. Slough confirmed that only she and Mr. Sanchez were present at the meeting during which Plaintiff received the September 25 report that terminated her employment.  Plf. Resp. Mot. Sum. J. Sex. Har., Ex. F, Slough Dep. at 77–78 (doc. #51).

Defendant contends the evidence reveals Ms. Mullan had final authority to terminate Plaintiff, has never been accused of harboring discriminatory animus, and that she chose to terminate Plaintiff's employment because she engaged in disrespectful and discourteous conduct in the presence of a sales manager and had received prior negative reports for

19

disrespectful or discourteous conduct.  Defendant argues that while Plaintiff may dispute that she used foul language, she does not dispute that the sales manager complained about her to Ms. Mullan, that Ms. Mullan received the compliant, or that Ms. Mullan decided to terminate Plaintiff upon the basis of the sales manager's complaint and her August 8 documented misconduct.

However, the question is not whether Ms. Mullan could have terminated Plaintiff on the basis of the sales manager's complaint and the August 8 misconduct, "but what actually did cause the adverse employment action."  BCI Coca-Cola Bottling, 450 F.3d at 492 ("The question is not whether Ms. Edgar could have terminated Mr. Peters because of his closing remark alone, which appears to have been permissible under BCI policy.").  In EEOC. v. BCI Coca-Cola Bottling Co., 450 F.3d 476, 478 (10th Cir. 2006), an employee alleged his employer fired him on account of his race.  It was undisputed that the official who made the decision to terminate the employee had never met the employee and had no idea he was black.  Id.  But, that "official relied exclusively on information provided by [the employee's] immediate supervisor, who not only knew [the employee's] race but allegedly had a history of treating black employees unfavorably and making disparaging racial remarks in the workplace."  Id.  The incident that partly formed the grounds for the employee's termination was reported to the official solely by the allegedly biased supervisor and involved the employee's conduct towards that allegedly biased supervisor.  Id. at 491.  The defendant-employer also cited another instance of similar misconduct by the employee, documented in his personnel file, for terminating the employee.  Id. at 492–93.  The official knew of this

prior misconduct because she reviewed the employee's personnel file.  Id. at 492.  The Tenth

Circuit rejected the defendant-employer's contention that the official's simply pulling the

plaintiff's personnel file was sufficient independent investigation to break the causal chain

between the supervisor's discrimination and the employee's termination.  Id. at 492.  The

Court explained that the problem with the official's "investigation" is that the official "never

sought any other version of events, and therefore had no reason other than [the allegedly

biased supervisor's] report to believe that the file was relevant.  Simply pulling the file

therefore does not constitute an independent investigation, and a jury could conclude that [the

allegedly biased subordinate's] factually disputed report—the sole source of information on

which [the supervisor] relied—caused the termination."  Id.

        Similarly in this case, a jury could conclude on the facts thus far presented and taken

in the light most favorable to Plaintiff that Mr. Sanchez and Ms. Slough made the decision

to terminate Plaintiff and that Ms. Mullan simply ratified that decision on the basis of Ms.

Slough's recounting of the August 8 report, purportedly initiated and partly prepared by Mr.

Sanchez, which disciplined Plaintiff for not serving a customer without identification

allegedly pursuant to Defendant's policy.  A jury could also conclude that Ms. Mullan did

not conduct a sufficiently independent inquiry into the events underlying Plaintiff's August

8 conduct and, instead, relied entirely on the description of the incident from the report Mr.

Sanchez prepared.  By the same token, a jury could conclude from the facts presented thus

far that Ms. Mullan conducted a sufficiently independent investigation to break any causal

chain that existed between Mr. Sanchez's alleged bias and Plaintiff's termination and that

report of the misconduct by the sales manager in combination with the August 8 report of Plaintiff's rude behavior towards a customer, apart from her refusal to serve the customer alcohol, caused Ms. Mullan to decide to terminate Plaintiff's employment. Because of this genuine dispute of material fact, this Court cannot conclude at the summary judgment stage that the alleged hostile environment did not culminate in Plaintiff's termination.

D.

Even if Plaintiff does not establish her allegedly hostile work environment culminated in a tangible employment action, Defendant remains liable for the creation of such an environment by one of its supervisors unless it proves "by a preponderance of the evidence: (1) it 'exercised reasonable care to prevent and correct promptly any sexually harassing behavior,' and "(2) the plaintiff 'unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.'" Pinkerton, 563 F.3d at 1059 (quoting Ellerth, 524 U.S. at 765). Defendant is entitled to summary judgment on the basis of this affirmative defense "only if the evidence points but one way and is susceptible to no reasonable inferences supporting" Plaintiff. Mallinson-Montague v. Pocrinick, 224 F.3d 1224, 1228 (10th Cir. 2000).

Defendant argues it has carried its burden of the first prong of the Faragher/Ellerth affirmative defense because it had in place an adequate sexual harassment policy at the time Plaintiff claims she endured a hostile work environment. Defendant submitted a copy of its sexual harassment policy signed by Plaintiff and dated September 21, 2004. Def. Mot. Sum. J. Sex. Har., Ex. F (doc. #47). The policy states:

22

1. [Defendant] will not tolerate sexual harassment of any of its team members by any supervisor, customer, co-worker, or others in and around your job.

2. Sexual harassment is considered same by any unwelcome remarks (verbally or in writing), gestures, contact or suggestive looks at the work place. This would obviously include hugs and embraces.

3. What do I do if there is a violation? ANSWER: Report the incident to your supervisor unless that supervisor is involved in the complaint or has knowingly condoned the unwelcome act. Then go to the next higher supervisor until you feel comfortable. John Bushman's phone is 915/334-8881 for an appointment.

4. Top management will investigate the unwelcome act and the offender will be dealt with accordingly. Every attempt will be made to keep the matter confidential, but it may be necessary to divulge the identity of the alleged victim in order to confront the alleged perpetrator.

5. Any incident should be reported immediately and a written account given by the complainant before or after talking with the appropriate supervisor.

6. In the event that top management cannot resolve the issue to the satisfaction of the complainant, due to disputed facts, there shall be an independent arbitrator, trained in such matters, assigned to the dispute by management and he/she shall make the determination of facts and fault.

Finally, retaliation of any type against those reporting an incident will be dealt with most harshly.

Defendant also submitted the affidavit of Ms. Slough, its Human Resource Director at the Hotel, who averred that a memo regarding Defendant's sexual harassment policy has been posted in the employee break room at the Hotel since October 13, 2004. Def. Mot. Sum. J. Sex. Har., Ex. G, Slough Aff. at ¶ 5 (doc. #47). Attached to Ms. Slough's affidavit is a copy of that memo. The memo reiterates much of the above quoted policy and additionally instructs "[a]ny employee who believes that he/she is or may be subjected to such objectionable conduct must immediately contact their supervisor, your local Human Resources Director and/or General Manager." Plaintiff concedes she signed the policy but maintains that she did not receive a copy of the policy and had not seen it since September 21, 2004. Def. Mot. Sum. J. Sex. Har., Ex. B, Plf. Dep. at 76 (doc. #47). Nonetheless,

23

Plaintiff testified that she was aware of Defendant's sexual harassment policy.  Id.

Plaintiff argues Defendant's sexual harassment policy is inadequate and unreasonable because it "fails to conform to several guidelines" set by the Equal Employment Opportunity Commission (EEOC), but only points to two specific failings.  First, Plaintiff asserts the policy fatally does not provide a toll-free phone number for employees to report sexual harassment, thereby placing an obstacle of cost to an employee's access to the reporting channels and a disincentive to employees wishing to report harassment.  Second, Plaintiff contends the policy does not guarantee confidentiality of the alleged victim, again discouraging employees from reporting harassment.

In response, Defendant submitted a portion of the EEOC Guidelines.  Def. Reply Mot. Sum. J. Sex. Har., Ex. H (doc. #67).  The *Guidelines*, with emphasis on the "guidelines" aspect of Guidelines, indicate that:

> An anti-harassment policy and complaint procedure should contain, at a minimum, the following elements:
>
> ● A clear explanation of prohibited conduct;
> ● Assurance that employees who make complaints of harassment or provide information related to such complaints will be protected against retaliation;
> ● A clearly described complaint process that provides accessible avenues of complaint;
> ● Assurance that the employer will protect the confidentiality of harassment complaints to the extent possible;
> ● A complaint process that provides prompt, thorough, and impartial investigation; and
> ● Assurance that the employer will take immediate and appropriate corrective action when it determines that harassment has occurred.

Id.  The Tenth Circuit has similarly explained that an adequate sexual harassment policy

"prohibits sexual harassment, identifies the complaint procedure, and informs employees that disciplinary action might be taken against those who violate the policy." Pinkerton, 563 F.3d at 1062. Plaintiff has not provided any basis to conclude that Defendant was required by law to provide a toll free phone number nor has she suggested that Defendant's established complaint procedure was in some other way inadequate or inaccessible. As to Plaintiff's argument that the law requires Defendant's policy guarantee a reporting employee's confidentiality, Plaintiff fails to cite any law for that proposition. The Guidelines suggest that an employer should maintain a policy that protects "the confidentiality of harassment complaints *to the extent possible*." (emphasis added). In fact, the Fifth Circuit Court of Appeals concluded: "We find no support either in the statute or in the regulations for appellants' proposition that Title VII or the regulations thereunder require employers to maintain a confidential grievance procedure." Whitaker v. Carney, 778 F.2d 216, 220 (5th Cir. 1985). And, regardless, Defendant's policy pledges to make "every attempt . . . to keep the matter confidential" but acknowledges "it may be necessary to divulge the identity of the alleged victim in order to confront the alleged perpetrator."

Maintaining an adequate sexual harassment policy alone, however, "does not satisfy the employer's burden under the first prong of the Faragher/Ellerth defense because the employer not only must take reasonable care to prevent sexually harassing behavior but also to correct promptly any such behavior." Pinkerton, 563 F.3d at 1062. Plaintiff argues Defendant failed to promptly investigate and correct the sexual harassment after she complained to Ms. Slough about Ms. Vigil's and Mr. Sanchez's conduct. Plaintiff asserts

Ms. Slough made at the most a cursory investigation into her first complaint regarding Ms. Vigil and made no investigations or actions regarding the sexual harassment by Mr. Sanchez. Plaintiff testified she told Ms. Slough about the photograph incident with Ms. Vigil two days after it occurred as well as submitted a written complaint but that Ms. Slough told her that there was nothing she could do about it.  Plf. Resp. Mot. Sum. J. Sex. Har., Ex. B, Plf. Dep. at 47–49 (doc. #51).  In addition, Plaintiff testified that she complained twice to Ms. Slough about Mr. Sanchez's sexual harassment—once about his sexual comments and gestures (unbuttoning his pants, making comments about oral sex, etc.) to her and other female employees and once about his slapping her and another waitress on the buttocks.  Id. at 64–65; Plf. Resp. Mot. Sum. J. Sex. Har., Ex. C, Plf. Aff. at ¶ 13 (doc. #51).  She says she cannot not remember exactly when she had those conversations with Ms. Slough.  Plf. Dep. at 65.  Plaintiff also submitted the testimony of Ms. Turberville who asserted that she told her immediate supervisor, Ms. Vigil, about Mr. Sanchez's making sexually oriented comments.  Plf. Resp. Mot. Sum. J. Sex. Har., Ex. A, Turberville Dep. at 8, 10, 16 (doc. #51). Ms. Turberville testified that Ms. Vigil responded to her complaints by saying: "'Oh, don't worry about what Memo says.  He's harmless.  He won't do anything.'" and "'Oh, he doesn't mean it.  He's just joking.'" Id. at 8, 10.  Finally, Plaintiff testified that she complained on July 30 about the sexually harassing customer to Mr. Sanchez and that is when he informed her that Mr. Lasater had sent the customer to see how she would handle the situation.  Plf. Dep. at 90.  But, Plaintiff admitted that she told no other supervisor besides Mr. Sanchez about the sexually harassing customer allegedly sent by Mr. Lasater.  Id.

Defendant contends that it did promptly and effectively respond to Plaintiff's complaint to Ms. Slough about Ms. Vigil showing picture(s) of Plaintiff at work.  Ms. Slough testified that upon learning about the picture incident from Plaintiff that she spoke with Ms. Vigil about the photograph, told her to delete the photograph from the Hotel computer, and ascertained that the photograph had been deleted.  Def. Mot. Sum. J. Sex. Har., Ex. D, Slough Dep. at 41, 46 (doc. #47).  Ms. Vigil testified that Ms. Slough talked to her about the photograph, asking if there was such a photograph and if there was, to delete it.  Def. Mot. Sum. J. Sex. Har., Ex. E, Vigil Dep. at 21–22 (doc. #47).  Ms. Vigil testified that she cannot recall Ms. Slough saying anything else to her about the incident.  Id. at 22.  Defendant also notes that Plaintiff admitted the incident with the photograph did not happen again.  Def. Mot. Sum. J. Sex. Har., Ex. B, Plf. Dep. at 54 (doc. #47).

The court is again presented with a classic genuine dispute of fact.  A jury could credit Plaintiff's testimony that Ms. Slough told her she could do nothing about Ms. Vigil's displaying the photograph.  A jury could also credit Ms. Slough's or Ms. Vigil's testimony that Ms. Slough promptly investigated the matter and ensured the photograph was deleted.  Or the jury could credit some combination thereof, finding that Ms. Slough only ensured the photograph was deleted and unreasonably took no punitive action of any variety towards Ms. Vigil in response to her displaying nearly nude photographs of Plaintiff at work and to other individuals.

As to Plaintiff's alleged complaints about Mr. Sanchez, Defendant first claims that Plaintiff cannot argue Defendant did not act promptly because she cannot remember when

27

she complained to Ms. Slough.  Second, Defendant claims that Plaintiff alleges Mr. Sanchez *and* Ms. Slough both sexually harassed her.  According to Defendant, its complaint procedure therefore dictated Plaintiff had to complain to someone other than Ms. Slough or Mr. Sanchez about Mr. Sanchez's conduct.  Because Plaintiff by her own admission did not complain to a supervisor of any higher authority than Ms. Slough, Defendant contends it was not provided the opportunity to investigate Plaintiff's claims.

With the regard to the first argument, Plaintiff does not complain about the delay in Defendant taking corrective action or argue that Defendant did not *promptly* respond to her complaints.  Instead, she argues Ms. Slough made *no* effort to correct the complained of behavior by Mr. Sanchez.  A defendant-employer is entitled to summary judgment on the basis of the Faragher/Ellerth defense when it demonstrates it not only promptly responded but that it also took reasonable steps to correct the complained of sexual harassment.  See Pinkerton, 563 F.3d at 1062 ("[T]he employer not only must take reasonable care to prevent sexually harassing behavior but also to correct promptly any such behavior.").  Plaintiff does not raise an issue as to the reasonableness of the delay in Defendant's response; rather she raises the issue of whether there was any response at all.  And, a jury could credit Plaintiff's testimony that she complained twice about Mr. Sanchez's conduct to Ms. Slough and yet she did nothing.  Or, a jury could believe Ms. Slough that Plaintiff never made any such complaints.  A jury could also credit Ms. Turberville's testimony that she complained to her immediate supervisor, Ms. Vigil, about Mr. Sanchez's conduct, as Defendant's policy instructed her to do, but that Ms. Vigil dismissed her complaints and took no steps to correct

28

Mr. Sanchez's behavior and, therefore, impute knowledge of Mr. Sanchez's sexual harassing

behavior to Defendant.  See Wilson v. Tulsa Junior College, 164 F.3d 534, 542 (10th Cir.

1998) (explaining that an employer is obligated to respond to harassment of which it has

actual knowledge, that actual knowledge is usually demonstrated where the plaintiff has

reported the harassment to management-level employees, but that "a 'low-level supervisor'

may also be a management-level employee for purposes of imputing knowledge to the

employer when is titled supervisor and has some authority over other employees"); Adler v.

Wal-Mart Stores, Inc., 144 F.3d 664, 674 (10th Cir. 1998) ("Mr. Larson was a low-level

supervisor, but also a management-level employee for our purposes because he was titled

'supervisor' and had some authority over Plaintiff, and many of her coworkers, and reported

to Mr. Kirchmeier. . . .  Thus, the incidents of which Plaintiff told either Mr. Kirchmeier or

Mr. Larson, or both, put Wal-Mart on actual notice and triggered Wal-Mart's obligation to

respond.").  Because a jury could credit either Plaintiff or Defendant's version of the facts

surrounding Defendant's response to complaints about Mr. Sanchez's conduct, Defendant

has not satisfied the first prong of the Faragher/Ellerth defense sufficient to warrant summary

judgment.

Defendant's second argument that Plaintiff cannot demonstrate it did not promptly

respond to her complaints about Mr. Sanchez because Plaintiff made her complaints to the

"wrong" supervisor would seem to go the second prong of the Faragher/Ellerth

defense—whether Plaintiff unreasonably failed to avail herself of the preventive or corrective

opportunities Defendant's policy afforded her.  Regardless, to this Court's knowledge

Plaintiff does not contend Ms. Slough sexually harassed her, rather she maintains that Ms. Slough unreasonably failed to correct Mr. Sanchez's conduct after Plaintiff notified her of it.  Defendant's policy instructs employees they should notify their "supervisor [of their complaint] unless that supervisor is involved in the complaint or has knowingly condoned the unwelcome act. Then go to the next higher supervisor until you feel comfortable." Defendant's memo on its policy, allegedly posted in the Hotel's break room, tells employees to "contact their supervisor, [their] local Human Resources Director and/or General Manager."  According to Plaintiff, she did exactly that—she spoke to her local Human Resources Director, Ms. Slough, twice about Mr. Sanchez's sexual harassment but to no avail.  "The Ellerth/Faragher defense does not require a harassed employee to make repeated complaints, even if those complaints go unheeded."  Loya v Wal-Mart Stores East, L.P., 669 F.Supp.2d 1266. 1285 (D.N.M. 2009).  Drawing all reasonable inferences in favor of the Plaintiff, a jury could conclude she did reasonably avail herself of Defendant's sexual harassment policy.  Therefore, Defendant has also not satisfied its burden as to the second prong of the Ellerth/Faragher defense sufficient to warrant granting summary judgment in its favor on Plaintiff's sexual harassment claim.

The July 29 incident involving the sexually harassing customer and Plaintiff's July 30 reporting to Mr. Sanchez demands a brief aside.  Defendant briefly points out that Plaintiff admits she told no one other than Mr. Sanchez about the sexually harassing customer.  A jury could conclude that Mr. Sanchez told Plaintiff that Mr. Lasater sent the offensive customer because of his own discriminatory animus or that his issuing her a negative Employee

Performance Report for Plaintiff's response to the customer's sexual harassment was sexual harassment as well.  See Arthur Larson, Employment Discrimination, § 46.07[4] (2d ed.) ("The EEOC guidelines provide that: 'An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action.").  As such, a jury could conclude it was just another example of the hostile work environment Mr. Sanchez created and that Plaintiff had already complained about twice to Ms. Slough and that Ms. Turberville had complained about to Ms. Vigil.  Plaintiff has, therefore, presented sufficient evidence to raise a genuine issue of fact as to whether she reasonably availed herself of Defendant's complaint procedure and that Defendant was otherwise on notice of Mr. Sanchez's conduct, including the July incident.

## V.

Title VII prohibits an employer from retaliating against an individual who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  The Tenth Circuit has explained that:

> "To establish a prima facie case of retaliation, a plaintiff must demonstrate (1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."

Pinkerton, 563 F.3d 1052, 1064 (10th Cir. 2009) (quoting Argo v. Blue Cross & Blue Shield

31

of Kan., Inc., 452 F.3d 1193, 1202 (10th Cir. 2006)).

## A.

Defendant does not dispute that Plaintiff's termination constitutes a materially adverse action. As best as this Court can tell, Plaintiff seems to also believe that the four Employee Performance Reports she received in August 2008 and that she claims formed the basis for her September 25 termination, constitute materially adverse actions. The Court notes, however, Plaintiff has not actually cited any law to support the claim that these four reports, separate and apart from the report which notified her of her termination on September 25, constitute materially adverse actions. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 56 (2006) ("We also conclude that [Title VII's antiretaliation] provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant.").

To constitute a materially adverse action "a plaintiff must show that 'a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' Requiring this level of adversity, the [Supreme] Court instructed, is necessary 'to separate significant from trivial harms' and inconveniences." Williams v. W.D. Sports, N.M., Inc., 497 F.3d 1079, 1087 (10th Cir. 2007) (quoting White, 548 U.S. at 68) (internal citations omitted); see also PVNF, 487 F.3d at 803 n. 8 (explaining that a written warning from an employer will only constitute an adverse action for the purposes of a retaliation claim if it "would dissuade a reasonable employee from engaging in protected

32

activity"). The Supreme Court has specifically rejected the argument "that only those actions which affected the terms and conditions of employment [are] actionable" under Title VII's antiretaliation provision. <u>Williams</u>, 497 F.3d at 1079 (citing <u>White</u>, 548 U.S. at 61–66). Thus, to survive summary judgment on her retaliation claim on the basis of the four August Reports, Plaintiff need only show "that a jury could conclude that a reasonable employee in [Plaintiff]'s shoes would have found the [D]efendant's conduct sufficiently adverse that he or she well might have been dissuaded by such conduct from making or supporting a charge of discrimination." <u>Williams</u>, 497 F.3d at 1090.

Despite Plaintiff's failure to enunciate clearly this legal argument or highlight many relevant facts to support it, one does not have to think long or hard to see why the record provides a sufficient basis upon which a jury could conclude that a reasonable employee in Plaintiff's shoes may have found the August reports so adverse that he or she might have been dissuaded from making complaints. Defendant does not dispute it gave all four of the August reports to Plaintiff on August 21, despite the fact that each report refers to conduct that Plaintiff allegedly engaged in on four different days—July 29, August 1, August 2, and August 8. Plf. Resp. Mot. Sum. J. Retal., Ex. D–G (doc. #49). Each report contains a section titled "Potential results if action not followed." In three of these reports, Defendant indicated in that section "Further disciplinary action up to and including termination." In the fourth report, again given to Plaintiff the same day as the other three but refers to conduct that occurred on August 8, the "Potential results if action not followed" section reads: "Immediate termination." This report also stated: "This is final warning to [Plaintiff]

33

regarding discourteous conduct toward guests.  Any further incident of discourteous conduct toward a guest will result in immediate termination."  The Tenth Circuit has explained that warnings given to an employee may be adverse when they increase the chance that termination would result from further infractions.  See Roberts v. Roadway Exp., Inc., 149 F.3d 1098, 1104 (10th Cir. 1998) ("[T]he record indicates that the more warnings an employee received, the more likely he or she was to be terminated for a further infraction. . . . This alone is enough to constitute adverse action."); Marx v. Schnuck Mkts., Inc., 76 F.3d 324, 329 (10th Cir.1996) (noting that pattern of retaliation began with the plaintiff being "written up").  Because three of the August reports indicate that if Plaintiff did not correct her behavior further disciplinary action including termination would result and the fourth August report explicitly declared a further infraction would result in her immediate termination, a jury could conclude these reports were sufficiently adverse so as to dissuade a reasonable employee in Plaintiff's shoes from making further complaints about her hostile work environment.

## B.

To satisfy the causation element for a prima facie case of retaliation, the "plaintiff must show that the individual who took adverse action against [her] knew of the employee's protected activity.'" Montes, 497 F.3d at 1176 (quoting Williams, 983 F.2d at 181); see also Hinds v. Sprint/United Mgmt. Co., 523 F.3d 1187, 1200 (10th. Cir. 2008) (explaining that generally "information of which an employer is unaware cannot be inferred to be the basis for the employer's decision to take action against the employee").  But, alternatively, the

34

plaintiff may prove that an employee who knew of the plaintiff's protected activity "used . . . the person who effected the adverse action, 'as a cat's paw to effect . . . her own biased designs.'" Montes, 497 F.3d at 1176 (quoting Young v. Dillon Co., Inc., 468 F.3d 1243, 1253 (10th Cir. 2006)). The Tenth Circuit has explained that "[t]o survive summary judgment on a subordinate bias theory, the plaintiff must first establish a genuine issue of material fact concerning the bias of the subordinate." BCI Coca-Cola Bottling Co., 450 F.3d at 488. And, second the "plaintiff must establish more than mere 'influence' or 'input' in the decisionmaking process. Rather, the issue is whether the biased subordinate's discriminatory reports, recommendation, or other actions *caused* the adverse employment action." Id. at 487 (emphasis added). But, an employer may nonetheless avoid liability "by conducting an independent investigation of the allegations against an employee. In that event, the employer has taken care not to rely exclusively on the say-so of the biased subordinate, and the causal link is defeated." Id. at 488.

Informal complaints to superiors or otherwise using an employer's internal grievance procedures constitute protected activity under Title VII. O'Neal v. Ferguson Const. Co., 237 F.3d 1248, 1255 (10th Cir. 2001); Robbins v. Jefferson County Sch. Dist. R-1, 186 F.3d 1253, 1258 (10th Cir. 1999). Plaintiff has submitted her deposition testimony in which she asserts she complained about Ms. Vigil's conduct to Ms. Slough and Mr. Sanchez. Plf. Resp. Mot. Sum. J. Retal, Ex. A, Plf. Dep. at 47–48, 52–53 (doc. #49). Plaintiff also testified that she spoke with Ms. Slough twice about Mr. Sanchez's conduct. Id. at 64–65. Consequently, Plaintiff has raised a genuine issue of fact as to Mr. Sanchez's and Ms. Slough's knowledge

of her Title VII protected activity.

1.

Defendant argues Plaintiff has failed to satisfy the causation element of retaliation's prima facie case as to her termination because Ms. Mullan possessed the final authority to terminate Plaintiff, had no knowledge of any of Plaintiff's alleged protected activity, and chose to terminate Plaintiff's employment because she engaged in disrespectful and discourteous conduct in the presence of a sales manager and had received prior negative Employee Performance Reports for disrespectful or discourteous conduct.[2]  In response, Plaintiff argues that Defendant cannot avoid liability by using a newly hired general manager as a "strawman" with regard to Plaintiff's termination.[3]  Plaintiff contends that despite Ms.

---

[2] Ms. Mullan's affidavit mentions that Plaintiff had "received various negative Employee Performance Reports, a number of which were for disrespectful or discourteous conduct to customers, supervisors or fellow employees, based on written statements by customers or other employees," Def. Mot. Sum. J. Retal., Ex. E, Mullan Aff. at ¶ 9 (doc. #44).  Ms. Mullan also signed each of Plaintiff's August reports.  Plf. Resp. Mot. Sum. J. Retal., Ex. D–G (doc. #49).  But Plaintiff's termination report and the emails between Ms. Mullan and Ms. Slough only specifically mention one previous instance of Plaintiff's rude behavior to customers—the August 8 incident.  Def. Mot. Sum. J. Retal., Ex. D (doc. #44).

[3] To support this argument Plaintiff cites a case from the New Mexico Court of Appeals considering a retaliation case under the New Mexico Occupational Health and Safety Act and a case from the Tenth Circuit reviewing a National Labor Relations Board's (NLRB) decision and citing the NRLB's rule of imputing the supervisor's knowledge to an employer where the employer does not negate imputing such knowledge.  Neither of these cases have any import upon the Tenth Circuit's clear precedent that Title VII retaliation plaintiff must demonstrate that the supervisor who took the adverse action against her either knew of the employee's protected activities or was used by a biased subordinate to effect his own discriminatory designs.  Montes, 497 F.3d at 1176 (10th Cir. 2007).

Mullan's declarations otherwise, Mr. Sanchez and Ms. Slough, both of whom were aware of her complaints of sexual harassment, made the decision to terminate Plaintiff. As previously explained, Plaintiff has demonstrated genuine issues of material fact surrounding the cause of her termination exist. A jury could conclude on the facts thus far presented and taken in the light most favorable to Plaintiff that Mr. Sanchez and Ms. Slough made the decision to terminate Plaintiff and that Ms. Mullan simply ratified that decision on the basis of Ms. Slough's recounting of the August 8 report, purportedly prepared by Mr. Sanchez and Ms. Slough, which disciplined Plaintiff for not serving a customer without identification allegedly pursuant to Defendant's policy. A jury could also conclude that Ms. Mullan did not conduct a sufficiently independent inquiry into the events underlying Plaintiff's August 8 conduct and, instead, relied entirely on the description of the incident from the report Mr. Sanchez and Ms. Slough prepared. By the same token, a jury could conclude from the facts presented thus far that Ms. Mullan conducted a sufficiently independent investigation to break any causal chain that existed between Mr. Sanchez's and/or Ms. Slough's illegal bias. Because of this genuine dispute of material fact, this Court cannot conclude at the summary judgment stage that Ms. Slough and/or Mr. Sanchez did not cause Plaintiff's termination.

2.

All of the August reports indicate they were signed by Ms. Slough and Mr. Sanchez on August 21. Plaintiff apparently signed three of the four reports on August 21, but refused to sign one of them. Ms. Mullan as the Hotel's General Manager evidently signed all four reports on August 26—after they had been given to Plaintiff. But, Defendant asserts that

37

Plaintiff does not dispute that most of Plaintiff's negative Employee Performance Reports were based on complaints by customers and other employees who had no involvement in her alleged harassment.  Because the reports were based on complaints made by persons other than those involved in her sexual harassment complaints, Defendant claims the reports do not raise any inference of retaliation.  But, only two of the four reports mention customer complaints, one of which the court has already addressed—the August 8 incident when Plaintiff asked for identification of a customer before serving her alcohol in purported compliance with Defendant's own policy—and the July 29 incident during which Plaintiff claims a customer, who Mr. Sanchez told her Mr. Lasater sent, sexually harassed her.  Plf. Resp. Mot. Sum. J. Retal., Ex. D, G (doc. #49).  The other two do not mention customer complaints and instead could be based on a supervisor's report of misconduct.  Id., Ex. E, F. Regardless, a supervisor had to make the decision to issue a negative report on the basis of either the customer complaints or supervisor-observed misconduct.  And, Plaintiff has presented evidence that the two supervisors who knew of her protected activity are the same supervisors who prepared and issued the August reports, with Ms. Mullan only signing the reports after they had been given to Plaintiff as notice of her misconduct.  Therefore, Plaintiff has presented evidence that raises a genuine issue of fact as to the causal connection between her protected activity and the August reports.  See Byrd v. Ill. Dep't. Of Pub. Health, 423 F.3d 696, 711–712 (7th Cir. 2005) (explaining that the trier of fact should consider whether a non-decisionmaker selectively reported the plaintiff's misconduct to the defendant's decisionmaker—"if the Department would not have disciplined Byrd but for Pitzer's

recommendations, recommendations that jury could reasonably find were motivated by an illegal motive, then Pitzer's bias was a cause of Byrd's injury whether or not Kelly could reasonably be thought a mere cat's paw").

3.

"'[A] causal connection is established where the plaintiff presents evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" Williams, 497 F.3d at 1091; MacKenzie v. City & County of Denver, 414 F.3d 1266, 1279 (10th Cir. 2005). The Tenth Circuit has "held that 'unless the [adverse action] is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond mere temporal proximity to establish causation.'" Meiners v. University of Kansas, 359 F.3d 1222, 1231 (10th Cir. 2004); Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir.1999). "A six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient." Meiners, 359 F.3d at 1231. But the Tenth Circuit has cautioned that courts should read the close temporal proximity requirement too restrictively where a pattern of discrimination begins shortly after protected activity occurred and only later culminates in discharge. See Marx v. Schnuck Mkts. Inc., 76 F.3d 324, 329 (10th Cir. 1996).

Because Defendant gave Plaintiff the August reports less than a month after her July 30 complaint to Mr. Sanchez about the sexually harassing customer, Plaintiff has provided evidence of temporal proximity between her protected activity and these adverse actions.

Ramirez v. Okla. Dep't. of Mental Health, 41 F.3d 584, 596, abrogated on Eleventh
Amendment grounds (concluding a one and a half month delay between protected activity
and alleged retaliatory conduct sufficiently probative of a retaliatory motive to withstand
summary judgment).  Plaintiff additionally maintains she complained twice about Mr.
Sanchez's offensive conduct to Ms. Slough—once about his sexual comments and gestures
(unbuttoning his pants, making comments about oral sex, etc.) to her and other female
employees and once about his slapping her and another waitress on the buttock.  Plaintiff
cannot remember when exactly those conversations with Ms. Slough took place, though she
suggests they occurred at least after February or March 2008.  Plf. Resp. Mot. Sum. J. Retal.,
Ex. A, Plf. Dep. at 64–65 (doc. #49).  And, she stated in her affidavit that Mr. Sanchez
slapped her buttocks in September 2008.  Plf. Resp. Mot. Sum. J. Sex. Har., Ex. C, Plf. Aff.
at ¶ 9 (doc. #51).  Thus, if she complained to Ms. Slough about that conduct, she presumably
did so after it occurred in September 2008 but before she was terminated on September 25,
2008.  But despite the fact Plaintiff claims Mr. Sanchez slapped her on the buttocks in
September 2008 and thus she presumably complained about that behavior to Ms. Slough in
September 2008, Plaintiff actually refers to her July 30, 2008 complaint about the customer
sent by Mr. Lasater as her "last complaint about the sexual harassment."  So, she argues she
was fired approximately two months from her last complaint about sexual harassment.  Plf.
Resp. Mot. Sum. J. Retal. at 12 (doc. #49).  As a result, Plaintiff either engaged in protected
activity within the same month she was terminated, sufficiently establishing temporal
proximity to survive summary judgment on the causation prong.  Or, Plaintiff engaged in

40

protected activity within two months of her termination, putting her about four weeks short of three months and two weeks past one and one-half months. And, of course, a jury could also accept Defendant's version of the facts: Plaintiff never complained about Mr. Sanchez's conduct or the sexually harassing customer to anyone. But granting Plaintiff the benefit of every favorable inference, with the four August reports given to Plaintiff less than a month after her July 30 complaint followed about a month later by her termination, Plaintiff has established a genuine issue of fact as to the causation element of retaliation's prima facie case.

## C.

### 1.

"Once the plaintiff has made out a prima facie case, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action." Meiners, 359 F.3d at 1229. Defendant maintains Plaintiff was terminated because she displayed rude, disrespectful and discourteous conduct in the presence of a sales manager and a potential client, and had engaged in similar documented behavior in the past. The September 25 report notifying Plaintiff of her termination confirms that was Defendant's proffered reason for her termination. Rude behavior to or in front of customers constitutes a legitimate, nondiscriminatory reason for firing someone, particularly in the hospitality industry.

Now that Defendant has articulated a legitimate reason for Plaintiff's termination, Plaintiff must demonstrate Defendant's asserted reason is pretextual. Pinkerton, 563 F.3d at 1064. To demonstrate pretext, Plaintiff "must produce evidence of 'such weaknesses,

41

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.' PVNF, 487 F.3d at 805 (quoting Argo, 452 F.3d at 1203). A plaintiff's evidence for pretext may take many different forms, but "[a] plaintiff typically makes a showing of pretext in one of three ways: (1) with evidence that the defendant's stated reason for the adverse employment action was false . . . ; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances . . . or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff." Kendrick v. Penske Transp. Serv., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000). But it is not the job of the courts to "second guess the business judgment of the employer." Seleneke v. Med. Imaging of Colo., 248 F.3d 1249, 1261 (10th Cir 2001). In conducting the pretext inquiry, this court must "examine the facts 'as they appear to the person making the decision to terminate [the] plaintiff.'" Id. "It is the manager's perception of the employee's performance that is relevant, not [the] plaintiff's subjective evaluation of his own relative performance." Furr v. Seagate Tech., Inc. 82 F.3d 890, 988 (10th Cir, 1996).

The September 25 report that terminated Plaintiff indicates Plaintiff was previously corrected for her disrespectful behavior towards customers on August 8. That is the only previous instance of documented misconduct the termination report mentions. One of the

four August Employee Performance Reports indicates it is about an incident that occurred on August 8 based upon a comment card submitted by a guest who said Plaintiff would not serve her because she did not have identification with her but was over fifty years old and so, by her own admission, looked well over the legal age—the same incident Ms. Slough described in her email to Ms. Mullan as an example of Plaintiff's documented similar misconduct.  Def. Mot. Sum. J. Retal., Ex. D (doc. #44).  The comment card is attached to that Report which Defendant submitted with its reply to Plaintiff's response to its motion for summary judgment and reflects the fact the guest was quite dissatisfied with Plaintiff's refusing to serve her and Plaintiff's subsequent attitude towards her, and intended to notify Defendant's corporate office.  Plaintiff does not deny the incident occurred.  She actually signed the Report and wrote "I thought I was doing what was right."

Nonetheless, Plaintiff claims the reason behind her termination was pretextual.  First, Plaintiff denies making the comment the sales manager described in her email to Ms. Mullan. Second, Plaintiff submitted the deposition of her supervisor, Mr. Sanchez, who testified that it was Defendant's policy to request identification from everyone, regardless of how old they appeared, before serving them alcohol.  Mr. Sanchez testified at this deposition that it was Defendant's policy to request identification from every customer regardless of how old they appeared and to refuse to serve customers who lacked identification.  Plf. Resp. Mot. Sum. J. Retal., Ex. B, Sanchez Dep. at 30–31 (doc. #49).  The report indicates, however, the guest who filed the complaint that triggered this report, watched Plaintiff serve other guests without asking for their identification and that Plaintiff was otherwise disrespectful to her.

43

Def. Mot. Sum. J. Retal., Ex. D (doc. #44).  Taking the facts in the light most favorable to Plaintiff, a jury could conclude that Plaintiff's being disciplined for following Defendant's own policy reveals pretext not only behind the August 8 report but also her termination which cites the August 8 as part of the reason for her termination.  But, the jury could also conclude that the August 8 report reflects Plaintiff was disciplined not for refusing to serve an older looking customer without identification, but for not carding younger looking customers and being generally disrespectful to the complaining customer.  Because the facts allow such competing conclusions, Plaintiff has satisfied her burden to show a genuine dispute of material fact as to whether Defendant's reasons for her termination were pretextual.

2.

Plaintiff argues she has presented sufficient evidence of pretext to survive summary judgment as to the three other August reports as well.  She claims that before August 2008 she had not received written discipline for almost a year and a half, but that once she made multiple complaints about sexual harassment to her supervisors she was issued four write-ups on one day for conduct that occurred within a single month.  Defendant does not dispute all four August reports were given to Plaintiff on August 21.  Defendant does not suggest a reason for giving Plaintiff four reports on one day despite the fact that each report refers to conduct that Plaintiff allegedly engaged in on four different days—July 29, August 1, August 2, and August 8.  Plf. Resp. Mot. Sum. J. Retal., Ex. D–G (doc. #49).  Mr. Sanchez testified he did not remember exactly why he presented all of reports on the same day.  Plf. Resp.

Mot. Sum. J. Retal, Ex. B, Sanchez Dep. at 54 (doc. #49).

The August 1 report noted Plaintiff "was repeatedly absent from her assigned work area. Instead of performing her job assignments, she was in the banquets and restaurant area visiting with other employees." Plf. Resp. Mot. Sum. J. Retal., Ex. F (doc. #49). Plaintiff commented on the Report itself "was tending to Mystery Café. As I do every Friday night." In her response to Defendant's motion, Plaintiff argues there exist objective, factual disputes surrounding the basis of the report because she maintains she had been assigned to cover the Mystery Café but yet was disciplined by Mr. Sanchez and Ms. Slough, the same individuals she alleges were aware of her protected activity, for working there.

The July 29 report indicates Plaintiff "engaged in a verbal confrontation with a guest in the bar." Plf. Resp. Mot. Sum. J. Retal., Ex. G (doc. #49). In the section titled "What employee may do to avoid similar performance issue" the Report states "[i]f [Plaintiff] encounters a difficult or intoxicated guest, she should ask her supervisor for assistance. She should never engage in a confrontation with an angry or intoxicated client." Plaintiff signed this report but did not note any comments she had about the incident on it. In her response, Plaintiff asserts the incident underlying this report is actually the encounter she claims to have had with the customer Mr. Sanchez told her on July 30 had been sent by Mr. Lasater to sexually harass her to see how she would handle it and that she had "failed" the test.

And the third report reflects that on August 2, Plaintiff "served intoxicated guests. She appeared to know the guests and was aware that they had been drinking that evening and continued to serve them anyway." Plf. Resp. Mot. Sum. J. Retal., Ex. E (doc. #49). The

Report states "[i]f [Plaintiff] is in doubt about whether to serve a guest, she should consult her supervisor. [Plaintiff] is responsible for paying attention to the condition of the guests she is serving and should be able to recognize signs of intoxication."  Plaintiff signed the Report and commented: "Don't recall.  If I was serving someone [Ms. Vigil] thought was intoxicated they why didn't she suggest to me that they shouldn't be served?"

Given the arguably suspicious and unexplained sequence of the August reports in addition to Plaintiff's evidence of objective factual disputes surrounding the basis of at least three of the August reports, Plaintiff has raised a genuine issue of material fact as to whether the reasons for their issuance were mere pretext for Mr. Sanchez's and/or Ms. Slough's retaliatory motives.  Defendant's motions for summary judgment are hereby DENIED.

Entered for the Court

this 20th Day of August, 2010


_____

Bobby R. Baldock
United States Circuit Judge
Sitting by Designation

46